UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JAMES LEE LOVE,

         Plaintiff,                 DECISION AND ORDER

    v.                            15-cv-6130

CAROLYN W. COLVIN,

         Defendant.

## Preliminary Statement

Plaintiff James Lee Love ("plaintiff") brings this action pursuant to Title XVI of the Social Security Act seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for supplemental security income. See Docket # 1. Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. See Docket ## 12, 15.

## Background and Procedural History

On December 26, 2013, plaintiff applied for supplemental security income. Administrative Record ("AR.") at 143-48. On March 3, 2014, plaintiff received a Notice of Disapproved Claim. AR. at 78-89. Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). AR. at 90-92. On June 9, 2014, a hearing was held before ALJ John P. Costello. AR. at 38-64. At the hearing plaintiff appeared with his

attorney, Justin M. Goldstein. Id. Julie A. Andrews, a Vocational Expert, testified at the hearing. Id. On July 23, 2014, the ALJ issued a decision, determining that claimant was not disabled as of December 12, 2013, the day he applied for benefits. AR. at 20-29. On January 9, 2015, the Appeals Council denied review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. AR. at 1-7. This federal lawsuit followed.

## Medical History

Plaintiff alleges the onset date of his disability to be October 1, 2011.

On July 28, 2011, Dr. Kavitha Finnity completed a Psychological and Intellectual Assessment for determination of employability in which she opined that plaintiff suffers from depression, irritability, anger, and isolation, and has problems with concentration and his ability to sleep. AR. at 356-61. She determined that plaintiff was moderately limited (unable to function 50% of the time) in his ability to maintain attention and concentration, attend to a routine and maintain a schedule. AR. at 359. When determining plaintiff's employability Dr. Finnity found that plaintiff was unable to participate in any activities, except for treatment and rehabilitation, for approximately three to six months. AR. at 360. She specifically noted that plaintiff should seek psychological/psychiatric

treatment because he was suffering from depression that was limiting his vocational functioning. Id. Dr. Finnity did not determine that plaintiff was unable to work for more than six months due to his condition. Id.

Throughout 2012 and 2013 plaintiff was treated for mental health concerns at Rochester Rehabilitation Center by Deborah Balouris, LCSW. AR. at 363-70. On July 27, 2012, plaintiff was admitted for treatment at the Center for depressive disorder NOS, cannabis abuse, cocaine dependency, family discord, anger issues, and increase in mental health symptoms. AR. at 293-95. Admission notes indicate that plaintiff was not taking any medication at the time he was admitted into the program. Plaintiff was scheduled to receive treatment every two weeks. AR. at 363-66.

On July 27, 2012, Ms. Balouris conducted her first Psychological Assessment for Determination of Employability. Id. She determined that plaintiff was unable to work or participate in any activity except for treatment or rehabilitation. AR. at 365-66. She concluded that plaintiff needed to be psychiatrically stable before returning to work. Id. Plaintiff's GAF score was 50 at the time of the assessment. Id.

Plaintiff's second assessment by Ms. Balouris was conducted on December 12, 2012. She determined that plaintiff was unable to work or participate in any activity except for treatment or

3

rehabilitation, and needed to become psychiatrically stable even though his condition had improved to some degree as a result of him taking medication. AR. at 232-35, 367-70. Plaintiff's GAF score was 60 at the time of the second assessment.

In both assessments Ms. Balouris determined that plaintiff was very limited (unable to function 25% or more of the time) in his ability to maintain attention and concentration, and was moderately limited (unable to function 10-25% of the time) in his ability to follow, understand and remember simple instructions; perform complex tasks independently; and maintain a routine. AR. at 363-70.

During the course of his treatment at Rochester Rehabilitation Center plaintiff reportedly made some progress, particularly when dealing with his use of illegal drugs. AR. at 310, 312. However, he continued to exhibit low mood and anxiety that would escalate with his failure to take anti-anxiety medication. Treatment notes from an April 21, 2013 visit reference plaintiff having thoughts of hurting his attorney and feeling angry with him for not returning his calls. AR. at 328.

On December 6, 2013, plaintiff voluntarily admitted himself into Rochester General Hospital after a suicide attempt precipitated by the use of cocaine, heroin, ecstasy and consumption of alcohol. AR. at 272. Plaintiff was prescribed Zyprexia and released from the hospital the following day. AR.

4

at 275.

Plaintiff remained in treatment at Rochester Rehabilitation Center until December 23, 2013, at which point he withdrew from treatment to receive services at Genesee Mental Health Center. AR. at 293, 309. Discharge notes prepared by Ms. Balouris indicate that plaintiff continued to experience low moods, anxiety, and feelings of frustration because he was unable to find employment and because his social security claim was denied. AR. at 309. Plaintiff's GAF score was 60 at the time of his discharge from treatment. AR. at 296.

On December 10, 2013, plaintiff underwent an initial evaluation at Genesee Mental Health Center, where he remained in treatment through 2014. AR. at 340-54, 372-86. Admission assessment notes prepared on December 23, 2013 by plaintiff's therapist Jennifer Thompson, LCSW, indicate that plaintiff reported being depressed about his financial situation, and felt helpless, tearful, and agitated. He admitted having no regrets about hurting people in the past. AR. at 349. Plaintiff appeared anxious and angry. Id. His GAF score was 54. AR. at 352. Admission notes also make references to plaintiff's interest in pursuing employment as he had been unable to obtain employment due to prior criminal history. AR. at 350-52. Ms. Thompson recommended that plaintiff engage in individual treatment for "stabilization of [his] mood, decrease of anxiety and depression

symptoms and increase ability to handle daily life stressors."
AR. at 352.

Plaintiff's treatment at Genesee Mental Health primarily
consisted of an outpatient therapy multiple times per month to
decrease his negative symptoms and increase coping skills. AR.
at 373. During treatment plaintiff continued to use marijuana
several times per week. AR. at 379.

On February 1, 2013 and March 6, 2014, plaintiff was seen
by Dr. Lois Van Tol after he was referred to him from
plaintiff's previous primary care physician, Dr. Ippolito. AR.
at 247-60. Dr. Van Tol diagnosed plaintiff with, among other
limitations, generalized anxiety disorder, depressive disorder,
and antisocial personality disorder. AR. at 254. Dr. Van Tol
noted that plaintiff reported having panic attacks, seeing red
spots, getting violent, feeling very angry multiple times a day,
and not being able to interact with people. AR. at 258.

On January 13, 2014, Dr. Van Tol completed a questionnaire
for the New York Office of Temporary and Disability Assistance
in which he was not able to provide an opinion regarding
plaintiff's ability to do work-related activities, but
determined that plaintiff's alcohol abuse and cocaine use were
significant factors to his recovery. AR. at 247-53.

On January 30, 2014, plaintiff was evaluated by Dr. Adam
Brownfeld on behalf of the Commissioner of Social Services. AR.

6

at 333-36. Dr. Brownfeld diagnosed plaintiff with, among other limitations, severe major depressive disorder, and determined that his psychiatric problems significantly interfered with his ability to function on a daily basis and caused various limitations in his ability to relate to others, deal with stress, and maintain attention and concentration. AR. at 335-36. Dr. Brownfeld determined that plaintiff's intellectual functioning was below average, and that his attention, concentration and memory skills were impaired due to emotional distress secondary to depression. AR. at 335. Dr. Brownfeld also opined that plaintiff was markedly limited in appropriately dealing with stress; moderately limited in performing complex tasks independently; and mildly limited in maintaining attention, concentration, regular schedule, and learning new tasks. Id. He recommended that plaintiff continue with psychological treatment, psychiatric intervention and drug treatment, if needed. AR. at 336.

On February 21, 2014, Dr. Thomas Harding conducted a disability determination on behalf of New York State Division of Disability Determination. AR. at 65-74. Dr. Harding determined that plaintiff had the mental RFC to perform simple, repetitive tasks. Id. Dr. Harding diagnosed plaintiff with severe schizophrenia and other psychotic disorder, severe affective disorder, and substance addiction disorder. Id. at 68-69. Dr.

7

Harding determined that plaintiff was moderately limited in his ability to understand and remember very short and simple instructions, understand and remember detailed instructions, interact appropriately with the general public, accept instructions, get along with coworkers, maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, sustain an ordinary routine without supervision, and complete a normal workday without interruptions from his psychologically based symptoms. Id. at 70-71.

On May 23, 2014, plaintiff was seen by John Rushforth, MS, RN, NPP, a therapist with Genesee Mental Health Center, to determine the appropriate medication to control plaintiff's active mental health limitations and poor sleeping habits. AR. at 380-82. During the visit Mr. Rushforth noted that plaintiff admitted to having depression, anxiety, and hearing voices every week that command him towards destruction of property and violent acts. Plaintiff also admitted feeling irritable, angry, and agitated on a daily basis. Id. As a result of the visit, plaintiff was prescribed Zyprexa. Id.

On May 29, 2014, plaintiff was discharged from Genesee Mental Health Center and referred to attend the Genesee Personalized Recovery Oriented Services ("PROS") program to continue to his ongoing mental health treatment, medication

management, and group psychotherapy in order to increase his socialization skills and help him deal with depression and anger. AR. at 385-86. Discharge notes from Genesee Mental Health Center prepared by Jenna Antonacci, MSW, indicate that she was trying to work with plaintiff on anger management, but was not successful in doing so because the only way plaintiff could prevent getting angry was to "isolate [himself] at home and stay away from people." AR. at 385.   At the time of discharge from Genesee Mental Health Center plaintiff's GAF score was 54. AR. at 386. Upon discharge he was advised to continue mental health treatment. AR. 385-86.

On May 27, 2014, plaintiff was admitted into the PROS program to "address his functional deficits and attempt to find work." AR. at 388. At the time of admission plaintiff's GAF score was 50. AR. at 389.

An assessment for determination of disability was prepared by the PROS program on June 17, 2014, which found that plaintiff was unable to participate in any activity except for treatment or rehabilitation. AR. at 396.   The assessment also showed that he was moderately limited (unable to function 10-20% of the time) in all but one functional limitations. Plaintiff's GAF score remained at 50. Id.

## Hearing Testimony

Testimony of Plaintiff: On June 9, 2014, a hearing was held before ALJ John Costello. AR. at 38-64. Plaintiff testified that he was forty-five years old and that he was living with his mother. AR. at 44. He testified that he did not work and that he received "social services." Id. Plaintiff revealed that he held his last job in 2008 when he worked as a shirt presser for two months at a dry cleaning business. AR. at 45-47.

Plaintiff stated that he was not working because he felt irritated by people. AR. at 47. Plaintiff testified that following the advice of his therapist he enrolled into the PROS program one week prior to the hearing. Id. He revealed that the program was designed to teach him coping and anger management skills. AR. at 47-48.

Plaintiff stated that he had been taking medication to help him with mood swings and "bipolar disorder". AR. at 48. He noted that the medication helped him with sleeping problems he once had. AR. at 52.

Plaintiff also testified that he had problems getting along with people. AR. at 49. He revealed that he did not know how to property handle stressful situations, and that violence was the only way he knew how to deal with it. AR. at 55. Plaintiff further testified that he was incarcerated for seventeen years for "doing bad stuff to people." AR. at 55-56.

10

Plaintiff noted that his hobbies included fishing and cooking, however he stated that he had not fished in a while. AR. at 50. He testified that he typically spent his free time at home in his room. AR. at 52. Lastly, plaintiff revealed that he did not have a bank account, and that his mother did everything for him, including handling his finances, cooking and laundry. AR. at 51-53.

Testimony of the Vocational Expert: Julie Andrews, a vocational expert ("VE"), also testified at the hearing. The VE pointed out that plaintiff did not have any past relevant work history that satisfied the past relevant work requirements. AR. at 61.

For the first hypothetical, the ALJ asked the VE to assume "an individual of the same age, education, and work experience who has the residual functioning capacity to perform the full range of work at all exertional levels," but who "is limited to simple tasks, and [who] should only have occasional interaction with co-workers and the general public." AR. at 61-62. The VE testified that there were unskilled occupations an individual with those limitations could perform. AR. at 62. The VE further testified that one of such occupations was a laundry laborer position, an unskilled, SVP of two, medium exertion position that encompasses approximately 236,000 positions in the national economy. The second occupation was an industrial cleaner,

11

unskilled, SVP of two, medium exertion position that encompasses 1.4 million positions in the national economy. Id. The VE opined that these jobs could be performed by an individual limited to medium work.

Then the ALJ modified the hypothetical to consider an individual with the same limitations as in the first hypothetical, but limiting the individual to performing unskilled work without having any contact with coworkers or the general public. AR. at 62. The VE testified that there were no jobs in the national economy that such an individual would be able to do without additional training. Id.

**Determining Disability Under the Social Security Act**

The Evaluation Process:   The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five step

12

sequential evaluation process:

> 1. The Commissioner considers whether the
> claimant is currently engaged in substantial
> gainful activity.
>
> 2. If not, the Commissioner considers
> whether the claimant has a "severe
> impairment" which limits his or her mental or
> physical ability to do basic work
> activities.
>
> 3. If the claimant has a "severe
> impairment," the Commissioner must ask
> whether, based solely on medical evidence,
> claimant has an impairment listed in
> Appendix 1 of the regulations. If the
> claimant has one of these enumerated
> impairments, the Commissioner will
> automatically consider him disabled, without
> considering vocations factors such as age,
> education, and work experience.
>
> 4. If the impairment is not "listed" in the
> regulations, the Commissioner then asks
> whether, despite the claimant's severe
> impairment, he or she has residual
> functional capacity to perform his or her
> past work.
>
> 5. If the claimant is unable to perform his
> or her past work, the Commissioner then
> determines whether there is other work which
> the claimant could perform. The Commissioner
> bears the burden of proof on this last step,
> while the claimant has the burden on the
> first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20
C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of
proving her case at steps one through four. At step five, there
is a "limited burden shift to the Commissioner" to "show that
there is work in the national economy that the claimant can do."

13

Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that
Commissioner "need not provide additional evidence of the
claimant's residual functional capacity" at step five); see also
20 C.F.R. § 404.1560(c)(2).

When evaluating the severity of mental impairment, the
reviewing authority must also apply a "special technique" at the
second and third steps of the five-step analysis. Kohler v.
Astrue, 546 F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. §
404.1520a(a). First, the ALJ must determine whether plaintiff
has a "medically determinable mental impairment." Kohler, 546
F.3d at 265–66; see also 20 C.F.R. § 404.1520a(b)(1). If
plaintiff has such an impairment, the ALJ must "rate the degree
of functional limitation resulting from the impairment(s)" in
four broad functional areas: "(1) activities of daily living;
(2) social functioning; (3) concentration, persistence, or pace;
and (4) episodes of decompensation." Kohler, 546 F.3d at 266;
see also 20 C.F.R. § 404.1520a(c)(3). "[I]f the degree of
limitation in each of the first three areas is rated 'mild' or
better, and no episodes of decompensation are identified, then
the reviewing authority generally will conclude that the
claimant's mental impairment is not 'severe' and will deny
benefits." Kohler, 546 F.3d at 266; see also 20 C.F.R. §
404.1520a(d)(1). If plaintiff's mental impairment is considered
severe, the ALJ "will first compare the relevant medical

findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2). If plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266. If not, the ALJ will then make a finding as to plaintiff's residual functional capacity. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision: In applying the five-step sequential evaluation, the ALJ made the following determinations. At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since December 12, 2013, the application date. AR. at 22. At the second step, the ALJ found that plaintiff had severe impairments such as depressive disorder, anxiety, personality disorder, polysubstance abuse in remission, and bipolar disorder. Id. At the third step, the ALJ analyzed the medical evidence and found that plaintiff did not have a listed impairment which would automatically render him disabled. Id. The ALJ determined that plaintiff's mental impairments do not satisfy the "paragraph B" and "paragraph C" criteria of the applicable mental disorder listings. Id. The ALJ found that plaintiff had mild restrictions in activities of daily living, where he was able to dress, bathe, and groom

himself; prepare simple meals; do laundry; shop; fish; manage money; and use public transportation. Id. The ALJ also determined that plaintiff had moderate difficulties in social functioning and in getting along with people, especially with people of authority. AR. at 23. The ALJ noted that plaintiff usually spent time in his room watching television. Id.

The ALJ also determined that plaintiff had moderate difficulties in regards to concentration, persistence or pace, short attention span, and difficulties remembering things. Id. He also opined that plaintiff had experienced no episodes of decompensation of extended duration. The ALJ further determined that "paragraph B" criteria was not satisfied because plaintiff's mental impairments did not cause at least two "marked" limitations, or one "marked" limitation and one "repeated" episode of decompensation. Additionally, the ALJ concluded that the record did not contain medically documented history of a chronic mental disorder or a chronic affective disorder of at least two years in duration that had caused plaintiff more than a minimal limitation of ability to do basic work. Id.

Accordingly, the ALJ moved to the fourth step, where he determined that plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with nonexertional limitations of performing only

16

simple tasks with occasional interaction with coworkers and the general public. AR. at 23-24. The ALJ noted that plaintiff's impairments could be expected to cause the alleged mental health symptoms, but that plaintiff's statements regarding the intensity and persistence of his symptoms were not credible. Id.

Because plaintiff did not have past relevant work, the ALJ proceeded to the fifth step of the analysis and assessed plaintiff's RFC, age, education and work experience. AR. at 28. The ALJ determined that plaintiff's ability to perform work at all exertional levels had been compromised by nonexertional limitations. Id. The ALJ then proceeded to determine whether there were jobs in the national economy that a person of plaintiff's age, education, and work experience could perform. The ALJ found that plaintiff was "capable of making a successful adjustment to other work that exists in the national economy", and specifically found that plaintiff could perform work as a laundry laborer and industrial cleaner. AR. at 28-29.

### Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine *de novo* whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the

17

Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir.), cert. denied, 551 U.S. 1132 (2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447—48 (internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination. "Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the

administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

Plaintiff challenges the ALJ's decision on the grounds that the ALJ's RFC assessment was not supported by substantial evidence. See Plaintiff's Memorandum of Law in Support of the Motion for Judgment on the Pleadings (Docket # 12-1). More specifically, plaintiff takes issue with the ALJ's RFC finding that plaintiff's mental health limitations can be adequately

addressed by simply limiting his employment to "simple tasks and to occasional interaction with coworkers and the general public." AR. at 23-24. This Court agrees.

After analyzing the evidence regarding plaintiff's mental health issues, the ALJ stated: "The record shows the claimant has mental health problems. However, nothing indicates that the claimant's problems are disabling." AR. at 27. (emphasis added). While the ALJ is certainly free to weigh conflicting evidence and opinions, his assertion that nothing in the record indicates that plaintiff's mental health problems are disabling is a mischaracterization of the medical evidence and cannot be sustained. Indeed, almost all of the medical opinions in the record refer to various degrees of plaintiff's psychiatric limitations that contradict the ALJ's assertion that no evidence is present to suggest the plaintiff is disabled.

For example, at the request of the Commissioner, the plaintiff was examined by Dr. Adam Brownfeld. Dr. Brownfeld performed a psychiatric examination of plaintiff and diagnosed him as suffering from severe major depressive disorder. AR. at 336. He found plaintiff to be emotionally distressed with "impaired" attention, concentration and memory skills. Brownfield opined that plaintiff is "markedly limited in appropriately dealing with stress given his recent suicidal attempt." AR. at 335. Dr. Brownfeld concluded that the

20

"results of the evaluation appear to be consistent with psychiatric problems and this may significantly interfere with the claimant's ability to function on a daily basis." AR. at 335-36. (emphasis supplied). Oddly, particularly in light of the ALJ's conclusion that the record contained no evidence of disability, the ALJ stated that he was assigning "significant weight" to Dr. Brownfeld's opinion.

Dr. Thomas Harding also reviewed plaintiff's medical records on behalf of the Commissioner. Dr. Harding diagnosed plaintiff with "severe schizophrenia and other psychotic disorders" and identified a number of "moderate" limitations in plaintiff's abilities to interact appropriately with the general public and coworkers, understand and remember instructions, perform activities within a schedule, accept instructions and respond to criticism from supervisors, and complete a normal workday without interruptions from psychologically-based symptoms. AR. at 68-71.

The ALJ also determined that plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual." AR. at 27. Yet, the official record before the Court contains numerous treatment records over a significant period of time documenting limitations that strongly suggest disabling mental health impairments. In July 2011, Dr. Kavitha Finnity examined plaintiff and completed a

21

"Psychological Assessment for Determination of Employability."
AR. at 222-27. Dr. Finnity determined that plaintiff was unable
to function fifty percent of the time in his ability to maintain
attention and concentration, attend to a routine and maintain a
schedule, and, thus, unemployable. A similar assessment was
repeated in June 2014, and plaintiff was again found to be
unemployable due to similar mental health conditions. AR. at
396. In June 2015 plaintiff's treating mental health therapist
referred plaintiff to PROS program of Rochester General
Hospital. Plaintiff was assessed by and admitted to the PROS
program because of his "psychotic symptoms" and his "inability
to get out of his house on a consistent basis, to live
independently and to hold/maintain employment." AR. at 388.

    Treatment notes also confirm GAF scores consistent with
disabling psychiatric problems. The record reflects that
plaintiff's GAF scores continuously averaged between 50 and 60.
In fact, upon admission to the Rochester Rehabilitation program
his GAF score was measured at 50. His GAF scores fluctuated
during treatment at Rochester Rehabilitation, and upon discharge
in December of 2013 plaintiff's score was 60, the highest
reported score in the record. However, less than six months
later, at the time of his discharge from Genesee Mental Health
Center and subsequent enrollment into the PROS program in May of
2014, plaintiff's GAF score had deteriorated to 54 and 50. AR.

22

at 303, 310, 318, 321, 372, 386, 389. A GAF score in the range of 41 to 50 indicates "[s]erious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), at 34 (4th ed. rev. 2000). GAF scores are often cited to and relied upon by the Commissioner in assessing psychological functioning and they remain the scale used by mental health professionals to "assess current treatment needs and provide a prognosis," and are "accepted as medical evidence". Ramirez v. Astrue, No. 12-CV-6221, 2014 WL 2520914, at *12 (W.D.N.Y. Mar. 28, 2014). Indeed, time and time again, plaintiff's treatment records reference serious psychiatric symptoms, including anti-social tendencies, emotional instability, anxiety, escalated anger, inability to relate to others, and a desire to hurt people or destroy property. AR. at 257-60, 376, 379-80, 385.

Finally, the record contains the treatment notes of Deborah Balouris, LMSW, the only medical source that had a long-term treating relationship with the plaintiff.[1]   Ms. Balouris began

---

[1] Licensed social workers are not included in the list of acceptable medical sources, but § 404.1513(d) provides that the SSA "may also use evidence from other sources to show the severity of [the claimant's] impairment(s) and how it affects

treating plaintiff in June 2012, the day plaintiff first became a patient at Rochester Rehabilitation Center. She continued to see plaintiff regularly until December 23, 2013, when plaintiff withdrew from the program to attend treatment at Genesee Mental Health Center. AR. at 293, 309. Balouris' opinions are reflected in her detailed treatment notes, which consistently report plaintiff's depression, anxiety, rage, and anger issues, and determine that plaintiff was psychiatrically unstable, required continuous treatment, and was not able to work. AR. at

---

[her] ability to work." 20 C.F.R. § 404.1513(d). In addition, SSR 06-03p clarifies that "[t]he term 'medical sources' refers to both 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources.'" SSR 06-03p, 2006 WL 2329939, at *1 (SSA Aug. 9, 2006). SSR 06-03p explains that opinions from "non-medical sources," such as Ms. Balouris, are to be evaluated by using the applicable factors listed in the section "Factors for Weighing Opinion Evidence." Id. at **4-5 (e.g., how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment(s); and any other factors that tend to support or refute the opinion). SSR 06-03p also provides that an opinion from a "non-medical source" who, like Ms. Balouris, has seen the claimant in a "professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source," such as when "the 'non-medical source' has seen the individual more often and has greater knowledge of the individual's functioning over time and if the 'non-medical source's' opinion has better supporting evidence and is more consistent with the evidence as a whole." Id. at *6. The factors outlined in SSR 06-03p suggests that the ALJ should have given more than the "little weight" he assigned to Balouris' opinions.

363-70. She further determined that plaintiff was very limited in maintaining attention and concentration; and moderately limited in his ability to follow and remember instructions, perform simple and complex tasks independently, and maintain a routine and a schedule. AR. at 365, 368. Despite the temporary improvement of his mood swings due to taking medication that was relied upon by the ALJ in disregarding her opinion, Balouris reported that plaintiff continued to exhibit anxiousness and anger that required him to continue treatment to become psychiatrically stable. AR. at 325, 328, 330, 369-70.

In sum, the ALJ's finding that "nothing [in the record] indicates that the claimant's [mental health] problems are disabling" and that plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual" is not an accurate or fair reading of the record. AR. at 27 (emphasis added). To the contrary, the record pays tribute to a deeply troubled individual who has been repeatedly diagnosed and treated for long periods of time for significant mental health issues, including severe schizophrenia, depression, and at least one documented attempt to commit suicide. The record confirms medical opinions that the plaintiff is markedly limited in dealing with stress; has persistently low GAF scores indicating significant limitations in psychological functioning; and is often unable to maintain

attention and concentration, attend to a routine and maintain the type of schedule needed for competitive full time employment. Given this evidence, the ALJ's determination that plaintiff's non-exertional limitations can be accommodated by simply limiting his employment to jobs that only require "simple work with occasional contact with co-workers and the public" is not supported by substantial evidence. This error was not harmless and requires remand. See e.g., Haymond v. Colvin, No. 1:11-CV-0631 (MAT), 2014 WL 2048172, at *9 (W.D.N.Y. May 19, 2014) (the ALJ must make specific findings about the nature of the a claimant's stress, the circumstances that trigger it and the claimant's ability to work under such circumstances); Smith v. Astrue, No. 09-CV-470 (TJM/VEB), 2011 WL 6739509, at *7 (N.D.N.Y. Nov.4, 2011) (the ALJ was required to make sufficient findings concerning plaintiff's ability to deal with stress and it was an error to conclude that plaintiff was limited to "low stress" work).

For the above reasons, this case must be remanded for reconsideration of the ALJ's RFC determination based on plaintiff's mental health impartments and his ability to handle stress in accordance with the medical evidence contained in the record.

## Conclusion

The Commissioner's motion for the judgment on the pleadings (Docket # 15) is **denied**, and plaintiff's motion for the judgment on the pleadings (Docket # 12) is **granted**. The matter is remanded for further proceedings in accordance with this Decision and Order.

**SO ORDERED.**

Jonathan W. Feldman
UNITED STATES MAGISTRATE JUDGE

DATED: September 30, 2016
        Rochester, New York